[No. A104955. First Dist., Div. Five. June 19, 2008.]

MUZZY RANCH CO., Petitioner and Appellant, v.
SOLANO COUNTY AIRPORT LAND USE COMMISSION, Defendant and
Respondent.

**COUNSEL**

Howard Rice Nemerovski Canady Falk & Rabkin, Richard C. Jacobs, Jonathan W. Hughes for Petitioner and Appellant.

Dennis Bunting, County Counsel, and James Laughlin, Deputy County Counsel, for Defendant and Respondent.

**OPINION**

**STEVENS, J.**[*]—In 2002, respondent Solano County Airport Land Use Commission (Commission) adopted an airport land use compatibility plan for

---

[*]Retired Associate Justice of the Court of Appeal, First Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

the area surrounding the Travis Air Force Base (Travis). In *Muzzy Ranch Co. v. Solano County Airport Land Use Commission*\* (Cal.App.) (*Muzzy Ranch I*), we directed the trial court to issue a writ of mandate ordering the Commission to set aside its adoption of the plan due to its failure to comply with the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.). In *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372 [60 Cal.Rptr.3d 247, 160 P.3d 116] (*Muzzy Ranch II*), the California Supreme Court reversed, concluding that adoption of the plan was exempt from CEQA. In this case, we consider appellant's remaining challenges to the plan, including an argument that the plan is not "consistent with" an Air Force air installation compatible use zone (AICUZ) study prepared for Travis, as required by section 21675, subdivision (b) of the Public Utilities Code.[1] We reject appellant's contentions and affirm the trial court judgment denying the petition for writ of mandate.

FACTUAL AND PROCEDURAL BACKGROUND

The underlying summary is drawn from our earlier decision in *Muzzy Ranch I*.

Respondent Commission was established under the State Aeronautics Act (§ 21001 et seq.) for the purpose of "ensuring the orderly expansion of airports" and the adoption of appropriate land use measures in Solano County. (§ 21670, subd. (a)(2).)

On June 13, 2002, the Commission adopted the Travis Air Force Base Land Use Compatibility Plan (TALUP). The TALUP "sets forth land use compatibility policies applicable to future development in the vicinity of" Travis. "The policies are designed to ensure that future land uses in the surrounding area will be compatible with the realistically foreseeable, ultimate potential aircraft activity at the base." The compatibility policies in the TALUP are "intended to be reflected in the general plans and other policy instruments adopted by the entities having jurisdiction over land uses near Travis Air Force Base." Accordingly, the TALUP "affects and requires action by" the County of Solano and the cities of Dixon, Fairfield, Suisun City, and Vacaville. The TALUP also potentially impacts three other cities in Solano County and small portions of Napa and Yolo Counties.

The TALUP sets forth compatibility factors applicable to six geographic zones of various sizes around the airport. At issue in this case is "Compatibility Zone C," which "encompasses locations exposed to potential noise in

---

\*Reporter's Note: Review granted April 13, 2005, S131484. For Supreme Court opinion, see 41 Cal.4th 372.

[1] All further statutory references are to the Public Utilities Code unless otherwise indicated.

excess of approximately 60 dB CNEL[2] together with additional areas occasionally affected by concentrated numbers of low-altitude (below 3,000 feet MSL) aircraft overflights," excluding "[d]eveloped residential areas within existing city limits." Although the TALUP does not provide acreage or square mile measurements, it is clear from a map provided in the plan that Compatibility Zone C covers a very large land area within Solano County. Appellant asserts without objection from the Commission that Compatibility Zone C "encompasses hundreds of thousands of acres of private property in a wide swath [of] more than 600 square miles extending more than 35 miles through Solano County."

The TALUP freezes future residential development within Compatibility Zone C at the level permitted under current general plans and zoning regulations. It states, "No amendment of a general plan land use policy or land use map designation and no change of zoning shall be permitted if such amendment or change would allow more dwelling units in the affected area than are allowed under current zoning." It further states that "[t]o the greatest extent feasible, it is the objective of the [TALUP] to minimize new residential development within" Compatibility Zone C.

The Commission's resolution adopting the TALUP states that "based on advice provided by its legal counsel, the Commission finds that the [TALUP] is not a 'project' subject to [CEQA] because it would not cause a direct physical change or a reasonably foreseeable indirect physical change in the environment." On June 18, 2002, the Commission filed a "Notice of Exemption" declaring that adoption of the TALUP is exempt from CEQA because it is not a "project" within the meaning of Public Resources Code section 21065 and because it creates "[n]o possibility of significant effect on the environment," citing California Code of Regulations, title 14, section 15061, subdivision (b)(3).

Appellant Muzzy Ranch Co. is a limited partnership holding ownership interests in thousands of acres of property within the boundaries of the TALUP. On July 9, 2002, appellant filed a petition for writ of mandate and complaint for declaratory relief. Among other things, appellant contended that adoption of the TALUP violated CEQA and that the Commission abused its discretion by basing its land use restrictions on the noise limit standards and definition of the Travis "maximum mission" in the TALUP.

The trial court denied the petition and entered judgment in favor of the Commission. In *Muzzy Ranch I*, this court reversed, concluding that adoption

---

[2] "60 dB CNEL" means 60 decibel "community noise equivalent level," which "represents the average daytime noise level during a 24-hour day, adjusted to an equivalent level to account for the lower tolerance of people to noise during evening and nighttime periods relative to the daytime period."

of the TALUP was a "project" within the meaning of CEQA because it had the potential to result in physical change to the environment by displacing housing development from the Travis vicinity to elsewhere in the region. The California Supreme Court reversed this court's decision, agreeing that the TALUP was a "project," but concluding that adoption of the TALUP fell within the "commonsense" exemption from CEQA for projects that have no potential to cause a significant effect on the environment. (*Muzzy Ranch II, supra*, 41 Cal.4th at pp. 388–389.)[3]

In *Muzzy Ranch I*, this court declined to address arguments made by appellant based on AICUZ studies prepared for Travis, because we invalidated the TALUP due to violation of CEQA. Following the Supreme Court's reversal on the CEQA issue, appellant requested that this court determine the remaining issues. We denied that request, pointing out that we had already issued a remittitur to the superior court because the Supreme Court had reversed this court without remanding for further proceedings. (See Cal. Rules of Court, rules 8.528, 8.272(b)(2)(A); cf. *Galanty v. Paul Revere Life Ins. Co.* (2000) 23 Cal.4th 368, 389 [97 Cal.Rptr.2d 67, 1 P.3d 658]; *Hamilton v. Asbestos Corp.* (2000) 22 Cal.4th 1127, 1149–1150 [95 Cal.Rptr.2d 701, 998 P.2d 403].) Appellant moved in the Supreme Court for issuance of a new remittitur. The Supreme Court denied the motion without prejudice to this court's recalling our remittitur and conducting further proceedings.

We recalled our remittitur and requested that the parties submit letter briefs addressing whether the Supreme Court's decision affects resolution of the remaining issues and providing any relevant new authority. We now proceed to address the remaining issues on the basis of the parties' original briefs and the supplemental letter briefs.

DISCUSSION

I. *The State Aeronautics Act and Airport Land Use Commissions*

Article 3.5 of chapter 4 of the State Aeronautics Act (§ 21001 et seq.) provides for the establishment of airport land use commissions (ALUC's) in California counties "to protect public health, safety, and welfare by ensuring the orderly expansion of airports and the adoption of land use measures that minimize the public's exposure to excessive noise and safety hazards within areas around public airports to the extent that these areas are not already devoted to incompatible uses." (§ 21670, subd. (a)(2).)

---

[3] In its briefing in *Muzzy Ranch I*, the Commission did not argue to this court that the commonsense exemption applied.

The powers and duties of ALUC's are described in section 21674. Those powers and duties include: "(a) To assist local agencies in ensuring compatible land uses in the vicinity of all new airports and in the vicinity of existing airports to the extent that the land in the vicinity of those airports is not already devoted to incompatible uses. [¶] (b) To coordinate planning at the state, regional, and local levels so as to provide for the orderly development of air transportation, while at the same time protecting the public health, safety, and welfare. [¶] (c) To prepare and adopt an airport land use compatibility plan pursuant to Section 21675. [¶] (d) To review the plans, regulations, and other actions of local agencies and airport operators pursuant to Section 21676." (§ 21674.)

At issue in this case is the adoption of an airport land use compatibility plan. "Each commission shall formulate an airport land use compatibility plan that will provide for the orderly growth of each public airport and the area surrounding the airport within the jurisdiction of the commission, and will safeguard the general welfare of the inhabitants within the vicinity of the airport and the public in general." (§ 21675, subd. (a).) Commissions are also now obligated to formulate such plans for areas surrounding military airports, such as Travis; at the time the TALUP was adopted commissions were authorized to adopt land use plans for military airports but not required to do so. (§ 21675, subd. (b), as amended by Stats. 2002, ch. 971, § 7.) To assist ALUC's in the performance of their duties, California's Department of Transportation prepared the California Airport Land Use Planning Handbook (Jan. 2002) (Handbook). "An airport land use commission that formulates, adopts, or amends an airport land use compatibility plan shall be guided by" the Handbook. (§ 21674.7, subd. (a).)

A city or county general plan relating to an area covered by an ALUC land use plan must be consistent with the commission's plan, unless the city or county governing body overrides the determination of the commission by a two-thirds vote. (Gov. Code, § 65302.3; Pub. Util. Code, § 21676, subd. (b).) The governing body must make specific findings that the portions of its general plan at issue are consistent with the purposes of article 3.5, as stated in section 21670. (Gov. Code, § 65302.3, subd. (c); Pub. Util. Code, § 21676, subd. (b).) Similarly, if a city or county proposes to amend its general plan or zoning ordinances within the planning area of an ALUC, it must first submit its proposed action to the commission for a determination of whether the action is consistent with the commission's land use plan. (§ 21676, subd. (b).) The city or county may override the determination of the commission with a two-thirds vote of its governing body based on specific findings that the proposed action is consistent with the purposes of article 3.5, as stated in section 21670. (§ 21676, subd. (b).)

II. *Section 21675, Subdivision (b)*

Appellant points out that, after adoption of the TALUP, section 21675, subdivision (b) was amended to provide that an ALUC plan for any military airport "shall be consistent with the safety and noise standards in the [AICUZ] prepared for that military airport." (§ 21675, subd. (b), as amended by Stats. 2002, ch. 971, § 7.) Appellant contends that the TALUP is not consistent with a 1995 AICUZ prepared for Travis because the safety and noise standards in the TALUP are *more restrictive* of development than those in the AICUZ. In particular, appellant contends that the TALUP's land use restrictions are based on a lower 60 dB noise contour line and the Commission's own "maximum mission" scenarios for the base.

As a threshold issue, the parties dispute whether the consistency requirement is applicable because the amendment adding the requirement was enacted after the TALUP was adopted in June 2002. (Stats. 2002, ch. 971, § 7.) We need not resolve this issue because the TALUP is, in any event, consistent with the 1995 AICUZ for Travis.

At issue is the meaning of the requirement in section 21675, subdivision (b), that airport land use compatibility plans be "consistent with" the applicable AICUZ's. Statutory construction is a question of law we decide de novo. (*Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 531 [85 Cal.Rptr.2d 257, 976 P.2d 808].) Our primary objective in interpreting a statute is to determine and give effect to the underlying legislative intent. (Code Civ. Proc., § 1859.) We begin by examining the statutory language, giving the words their usual, ordinary meaning. (*Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1063 [103 Cal.Rptr.2d 751, 16 P.3d 166].) "The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.] . . . [E]ach sentence must be read not in isolation but in the light of the statutory scheme [citation]; and if a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed [citation]." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) "If the terms of the statute are unambiguous, we presume the lawmakers meant what they said, and the plain meaning of the language governs." (*Estate of Griswold* (2001) 25 Cal.4th 904, 910–911 [108 Cal.Rptr.2d 165, 24 P.3d 1191].)

Appellant contends that the requirement that the TALUP be "consistent with" the AICUZ means that the TALUP must literally " 'adopt' or 'incorporate' Air Force identified areas of aircraft accident potential and noise" from the AICUZ. That construction finds some support in dictionary definitions of

"consistent" as "coherent and uniform" or "marked by harmony, regularity, or steady continuity throughout." (American Heritage Dict. (2000) p. 392, col. 2; Webster's 3d New Internat. Dict. (2002) p. 484, col. 2.) However, the word is also commonly defined as meaning "compatible" or "coexisting and showing no noteworthy opposing, conflicting, inharmonious, or contradictory qualities." (American Heritage, *supra*, p. 392, col. 2; Webster's, *supra*, p. 484, col. 2.) Webster's emphasizes that when the word means "compatible" it is usually used with "with," as is the case in section 21675, subdivision (b). (Webster's, *supra*, p. 484, col. 2.) As pertinent, "compatible" means "capable of existing together without discord or disharmony." (*Id.* at p. 463, col. 1.) Accordingly, although the consistency requirement could be interpreted to mean that the safety and noise standards used in an ALUC land use plan must be identical to those in the relevant AICUZ, use of the phrase "consistent with" suggests that the standards in the plan need only be compatible with those in the AICUZ.

■ Interpreting "consistent with" as requiring only compatibility is supported by the test for consistency developed in the local planning context, where specific development plans must be "consistent with" the applicable general plan. (Gov. Code, § 65454.) In that context, courts have held "state law does not require precise conformity of a proposed project with the land use designation for a site, or an exact match between the project and the applicable general plan. [Citations.] Instead, a finding of consistency requires only that the proposed project be '*compatible* with the objectives, policies, general land uses, and programs specified in' the applicable plan. (Gov. Code, § 66473.5, italics added.) The courts have interpreted this provision as requiring that a project be ' "in agreement or harmony with" ' the terms of the applicable plan, not in rigid conformity with every detail thereof." (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 678 [125 Cal.Rptr.2d 745].) Because this construction of the consistency requirement arises in a related context (*Muzzy Ranch II, supra*, 41 Cal.4th at p. 385),[4] it offers significant additional support for construing section 21675, subdivision (b), to mean that safety and noise standards in an airport land use plan must be compatible with those in the applicable AICUZ, but they need not be identical.

Moreover, this construction better comports with the Legislature's intent. The consistency requirement was adopted as part of Senate Bill 1468, which in 2002 amended section 21675 and various other statutory provisions. (Stats. 2002, ch. 971.) The Legislature's findings at the time indicate that the

---

[4] Notably, the consistency requirement in the general plan context is repeatedly referenced in the legislative history to Senate Bill No. 1468 (2001–2002 Reg. Sess.) (Senate Bill 1468), which added the language at issue to section 21675. Appellant's request for judicial notice of the legislative history of Senate Bill 1468 is granted.

intent of the enactment was to protect the continued viability of military installations in California. Statutes 2002, chapter 971, section 1 provides: "(a) The Legislature finds and declares all of the following: [¶] (1) California contains an integrated system of military installations and special use airspace, connected by low-level flight corridors, that provides a key foundation for our nation's security. This integrated system provides for the training of military personnel, as well as the research, development, testing, and evaluation of military hardware. [¶] (2) The military is a key component of California's economy comprising direct economic expenditures of over $29,800,000,000 each year, making the military larger than other economic sectors of the state, including agriculture, and the military represented over 263,000 working adults in the 2000–01 fiscal year. [¶] (3) The federal Department of Defense's research, development, test, and evaluation programs, which included $3,900,000,000 in direct 2000–01 fiscal year contracts in California, make an important contribution to maintaining the state's lead in technology development. [¶] (b) The Legislature therefore finds that the protection of this integrated system of military installations and special use airspace is in the public interest." (See Sen. Bill 1468.) In order to advance this goal, another aspect of the enactment requires that cities and counties, in fashioning the land use element in their general plans, "[c]onsider the impact of new growth on military readiness activities carried out on military . . . installations . . . ." (Gov. Code, § 65302, subd. (a)(2).)

Consideration of the legislative history of Senate Bill 1468 makes it clear that the act was a response to base closures after nearby development interfered with base operations. A background memorandum prepared by the Senate Bill author's office explained that "Urban encroachment near military bases threatens to impact the missions of many of the state's military bases. As major urban population centers spring up on once vacant land at the perimeter of military bases, the interests of residents, businesses, and government collide with the facility's mission objectives . . . . The resulting constraint on mission activity is that the facility can no longer effectively fulfill its mission and could become a candidate for the next round of closures . . . . [¶] . . . [¶] Closures have meant a loss of jobs on a large scale, and economic disaster for many of the communities where the bases once stood." In fact, the report listed Travis as one of the four (of 64) installations "facing the most significant pressure from urban growth."

Similarly, Senate and Assembly committee reports state that military officials are "concerned about civilian land uses encroaching on military bases. When counties and cities approve development near bases, residents often object to noisy or dangerous military operations and force their relocation." In a letter to the Senate Journal, the Senate Bill author wrote "[e]ncroachment on military activities in California is a matter of serious concern . . . . Increasingly, growth and development in the vicinity of military

land and airspace has the potential to impact military readiness activities carried out in the State. . . . [¶] The purpose of [Senate Bill] 1468 is to address and resolve urban encroachment impacts on military activities."

■ We seek to adopt a construction that will render the statute " 'reasonable, fair and harmonious with its manifest purpose.' " (*Conway v. City of Imperial Beach* (1997) 52 Cal.App.4th 78, 85 [60 Cal.Rptr.2d 402].) Viewing the statutory scheme as a whole, we conclude that "consistent with" means that the land use plan must be compatible with the applicable AICUZ. Because the purpose of Senate Bill 1468 was to protect the operations of military installations from encroachment by development, compatibility in this context means that the land use plan must be at least as protective of airport operations as the applicable AICUZ, but it need not literally adopt the safety and noise standards in the AICUZ.

Critically, there is no reason to think that the Legislature intended to prohibit ALUC's from adopting land use plans that prohibit more development than would be prohibited using the AICUZ safety and noise standards. Such a construction of the statute would not advance the legislative purpose of protecting military operations, and it could undermine that purpose by prohibiting ALUC's from adopting restrictions which they deem necessary to prevent encroachment, even if those restrictions go beyond the recommendations in the relevant AICUZ. The Department of Transportation's Handbook, to which ALUC's are obligated to look for guidance (§ 21674.7, subd. (a)), emphasizes that an ALUC may need to provide greater protection for military operations than that provided by the applicable AICUZ. The Handbook states, "AICUZ compatibility criteria tend to be minimal in terms of the degree of protection from incompatible land uses which they afford. ALUCs and local jurisdictions can and should consider setting higher standards in their own respective compatibility planning. Ensuring a high degree of land use compatibility around military airports is particularly prudent given the economic importance which major bases have to the surrounding communities and the fact that land use compatibility is one of the factors considered in the government's assessment of which bases to maintain in operation." (Handbook, *supra*, at p. 3-37.)

Moreover, appellant's construction of the statute would permit the military to dictate local land use policies and prevent local authorities from concluding that more protective measures are necessary to protect local safety and health. This would be inconsistent with the ALUC's statutory responsibility for protecting the public health, safety, and welfare (§ 21674) and inconsistent with repeated assurances in the legislative history that the bill does not take away local control. The Senate Bill author's background memorandum emphasized that "[Senate Bill] 1468 would encourage coordination between

local planning agencies and military bases in their jurisdictions in land use decisions to plan for growth in a way that allows military facilities to remain operative and allow cities and counties to maintain local decision-making authority. [¶] . . . [¶] [Senate Bill] 1468 is not an effort to interfere with the power of local governments to make planning decisions. Rather it is aimed at encouraging cities and counties to develop growth policies that reflect the contributions that military bases make to their communities, as well as their vital importance in the state's economy and in the defense of our nation." Various reports emphasize that the bill "maintain[s] local decision-making authority" or "equip[s]" local governments "with the information to consider military bases when making land use decisions." If we were to interpret the consistency requirement as appellant suggests, then decisionmaking authority regarding safety and noise standards would effectively be transferred to the Air Force officials who draft the AICUZ studies.

To support its argument that the consistency requirement obligated the Commission to "adopt" or "incorporate" Air Force standards from the AICUZ, appellant seizes upon two statements in the legislative history. First, it relates that the language at issue was added to the act after a committee report pointed out that " '[t]he airport land use planning law encourages but does not require ALUCs to recognize the military's AICUZ designations of accident prevention zones and noise contours' " and recommended that Senate Bill 1468 "require ALUCs to revise their plans and adopt the AICUZ designations." But the Legislature did not select the term "adopt"; instead it used the phrase "consistent with."

Second, appellant points to a Department of Finance report, which includes a characterization of the bill's purpose. The report states, "The author's office reports that naval officials worry about conflicts between civilian development interfering with military bases. Therefore, the purpose of this bill is to provide the United States Department of Defense with a mechanism for working with local governments and the state to incorporate military bases and needs into state and local general plans. For every military airfield the military has developed Zones to identify potential accident zones and particular noise concerns. The sponsor would like the PUC [sic] to incorporate these Zones into their general plans." Again, the more flexible phrase "consistent with" is used in the statute. The Senate and Assembly committee reports do not use the terms "incorporate" or "adopt." Appellant points to nothing in the legislative history revealing an intent to require literal adoption of Air Force standards despite local desire to use even more protective standards. To the contrary, as noted previously, Senate and Assembly committee reports emphasize local decisionmaking.

As we define the phrase, appellant has not shown that the TALUP is not "consistent with" the 1995 AICUZ safety and noise standards. Appellant does

not even attempt to argue that the TALUP inadequately protects military operations or that there is any incompatibility between the TALUP standards and those in the 1995 AICUZ. To the contrary, appellant's argument is that the high level of protection accorded to Travis operations is unjustified. The TALUP is not invalid under section 21675, subdivision (b).[5]

### III. *Appellant's Remaining Contentions*

Appellant contends that, even if the TALUP does not violate the consistency requirement in section 21675, subdivision (b), the TALUP is invalid because the Commission suppressed a new AICUZ study in 2000 and disregarded the noise data and the definition of the Travis "maximum mission" in the 1995 AICUZ study.

■ The Commission's adoption of the TALUP was a quasi-legislative act reviewable through a petition for traditional mandamus under Code of Civil Procedure section 1085. (*City of Coachella v. Riverside County Airport Land Use Com.* (1989) 210 Cal.App.3d 1277, 1289 [258 Cal.Rptr. 795]; see also *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 566–567 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) Our review is limited to determining whether the Commission's decision was "arbitrary, capricious, entirely lacking in evidentiary support, or unlawfully or procedurally unfair." (*Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 786 [187 Cal.Rptr. 398, 654 P.2d 168], disapproved on other grounds in *Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 918 [13 Cal.Rptr.2d 245, 838 P.2d 1198]; see also *City of Coachella*, at p. 1289; *Western States*, at p. 574.)

### A. *Alleged Suppression of a Year 2000 AICUZ*

Appellant urges that we invalidate the TALUP because the Commission "suppressed" a new AICUZ that the Air Force intended to issue in 2000. The argument is without merit.

The evidence shows that the Air Force decided not to update the 1995 AICUZ following the Commission's suggestion that Travis qualified for an

---

[5] Because it is clear that the TALUP is consistent with the safety and noise standards in the 1995 AICUZ, we need not consider whether an ALUC's determination that its plan is consistent is reviewed for abuse of discretion. On this issue the general plan context is distinguishable. There, great deference to a governing body's finding of consistency is appropriate because it is the body that adopted the general plan in the first place. (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco, supra*, 102 Cal.App.4th at pp. 677–679.) Here, the circumstances are different because the AICUZ studies are not prepared by the ALUC's.

exemption from an AICUZ study update. The Commission indicated that it was revising its plan for Travis and expressed concern that issuance of a new AICUZ would "introduce additional delays into the plan revision process in a way that would contravene the very intent of the AICUZ process." The Commission's noise consultant subsequently wrote to the Air Force, stating "our base case data collection, maximum mission, noise measurement, and modeling effort is dependent on Air Force input." He also expressed a desire to avoid duplicating "noise modeling" work recently completed by the Air Force and "to avoid the development of contradictory contours." Although there were initial indications that the Travis "footprint" had shrunk, the Commission subsequently learned "the new footprint is a mix of both shrinking and expanding in some places since 1995."

Ultimately, the Air Force granted the Commission's request for exemption of Travis from release of a new AICUZ study, "contingent on [the Commission's] adoption of the Travis AFB AICUZ 2000 study noise contour map and the AICUZ land use recommendations in their revision of the" TALUP. Appellant asserts that the Commission failed to comply with this requirement, but appellant has not shown that the TALUP failed to satisfy the Air Force's expectations. Neither has appellant shown that the Commission failed to consider the 2000 AICUZ data. The record indicates that the Commission's noise consultant considered such data to be critical to its work and that the consultant did consider the Air Force year 2000 contours. Appellant has not shown that any of the Commission's actions surrounding the proposed 2000 AICUZ study provide a basis to invalidate the TALUP.

## B. *Selection of 60 dB CNEL Noise Contour*

The TALUP recommends that local governments not allow new residential development in the 60 dB CNEL noise area at densities higher than allowed by current zoning. Appellant contends that the Commission acted unlawfully in using 60 dB CNEL as the basis for its noise contour rather than 65 dB CNEL as the noise contour.

The Commission's selection of 60 dB CNEL as the basis for its noise contour is supported by the Handbook. The Handbook states, "[M]ost federal and state of California regulations and policies set DNL/CNEL 65 dB as the basic limit of acceptable noise exposure for residential and other noise-sensitive land uses. Often overlooked, though, is that this standard has been set with respect to relatively noisy urban areas. For quieter settings and many—if not most—airports in California, CNEL 65 dB is too high of a noise level to be appropriate as a standard for land use compatibility planning. This view is particularly evident with respect to evaluation of proposed new land use development. Even FAA policy has evolved to where

the agency now will 'respect and support' local establishment of a lower threshold of noise exposure acceptability." (Handbook, *supra*, at p. 7-23.) The Handbook continues, "For the purpose of airport land use compatibility planning, the Department's advice is that CNEL 65 dB is not an appropriate criterion for new noise-sensitive development around most airports. At a minimum, communities should assess the suitability and feasibility of setting a lower standard for new residential and other noise-sensitive development." (*Id.* at p. 7-25.)

Appellant does not explain why it was arbitrary for the Commission to use the 60 dB CNEL noise contour, beyond the fact that the Air Force's position in 1995 was that residential land use was appropriate in the 60 to 64 dB CNEL range. As we have explained, the Commission was not required by law to adopt the same standard as used in the AICUZ. It was not arbitrary or capricious for the Commission to adopt the 60 dB CNEL standard in determining the compatibility of residential land uses.

### C. Maximum Mission

Finally, appellant contends the TALUP is invalid because it is based on a "maximum mission" scenario devised by the Commission, instead of the Air Force's own projection.

Section 21674.7, subdivision (a) provides that ALUC's "shall be guided by" the Handbook in adopting or amending an airport land use compatibility plan. In support of its position, appellant cites to language in the Handbook which requires ALUC's to hew closely to the predictions of airport operators in forecasting future activity. The Handbook states, "A caution with regard to updating of airport plans and forecasts for compatibility planning purposes, though, is that ALUCs must avoid assuming or suggesting that the layout or operation of the airport will change in a manner not anticipated by the entity responsible for the airport's operation. Assumptions regarding the fundamental *role* of the airport must remain as indicated in the adopted master plan or other policies of the airport proprietor." (Handbook, *supra*, at p. 2-6.)

However, that guidance does *not* apply to the TALUP. Regarding military airports the Handbook states, "Several factors make compatibility planning for military facilities distinct from that for civilian airports. [¶] . . . [¶] A particularly unique aspect of compatibility planning for military airports is

that aircraft activity forecasts of the sort done for civilian airports are not very meaningful. Military airport activity levels depend almost exclusively on the mission of the base and on national or international events involving military participation. A typical planning approach thus is to postulate a 'maximum mission' for the base. ALUCs wishing to anticipate the potential for yet greater aircraft operations impacts sometimes base their planning on a multiple of the maximum mission activity levels (a multiplier of 1.5 or 2, for example)." (Handbook, *supra*, at p. 3-36.) The Handbook states that the "best source of data" is normally the applicable AICUZ, but, as noted previously, it cautions that the "AICUZ compatibility criteria tend to be minimal in terms of the degree of protection from incompatible land uses" and that ALUC's should "consider setting higher standards" in light of the risk of base closure and the "economic importance which major bases have to the surrounding communities." (*Id.* at p. 3-37.) Accordingly, the Handbook does not obligate ALUC's to hew closely to the recommendations in AICUZ studies and, in fact, it recommends that ALUC's should endeavor to be more protective of base operations.

The TALUP's approach to the "maximum mission" issue is consistent with the Handbook. The TALUP includes the Commission's assumptions about potential future activity levels at Travis, accompanied by the caveat that "[p]reparation of aircraft operations forecasts in the traditional sense would not be very meaningful for [Travis] because activity levels are highly dependent upon world events and changes in the mission of the base." For purposes of determining compatible uses, the TALUP assumes future operations at double the current level, which assumption "allows for future long-term growth in military aircraft activity that is not necessarily reflected in the 'maximum mission' scenarios presently envisioned by the Air Force." The TALUP also assumes use of flight tracks not currently in use, use of a currently nonexisting assault landing strip, and establishment of a civilian air cargo hub at Travis. Appellant has not shown that any of these assumptions were unreasonable. The Handbook expressly mentions the possibility of increasing operations by multiples in order to account for potential growth, use of additional flight tracks and an additional strip would be consistent with growth in operations, and the Commission's noise consultant referenced discussions about the possibility of cargo operations at Travis.

In light of the Handbook's flexible approach to the issue, appellant has failed to establish that the Commission's definition of the Travis "maximum mission" was arbitrary or capricious.

## DISPOSITION

The judgment is affirmed.

Jones, P. J., and Simons, J., concurred.