Filed 6/28/22  Karney Management v. City of Los Angeles CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| KARNEY MANAGEMENT COMPANY, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF LOS ANGELES et al., <br><br> Defendants and Respondents, <br><br> N.S.B. ASSOCIATES, INC. et al., <br><br> Real Parties in Interest and Respondents. | B305188 <br><br> (Los Angeles County <br> Super. Ct. No. BS172677) |

APPEAL from a judgment of the Superior Court of Los Angeles County, John A. Torribio, Judge.  Affirmed.

Klapach & Klapach, Joseph S. Klapach; Luna & Glushon, Robert L. Glushon and Kristina Kropp for Plaintiff and Appellant.

Michael N. Feuer, City Attorney, Terry Kaufmann-Macias, Assistant City Attorney, Jennifer K. Tobkin and Parrish K. Knox, Deputy City Attorneys; Downey Brand, Kathryn Oehlschlager and Hina Gupta for Defendants and Respondents.

Glaser Weil Fink Howard Avehen & Shapiro, Clare Bronowski and Elizabeth G. Chilton for Real Parties in Interest and Respondents.

---

Real parties in interest N.S.B. Associates, Inc., FNL/Beatrice Partners, LLC, and SLG Partners, LLC (collectively, N.S.B.), applied to the City of Los Angeles (the City) for approval of a Frank Gehry-designed office and retail project in the Playa Vista neighborhood (the Project). Over repeated objections by Karney Management Company (Karney), the manager and owners' representative of the parcels located to the west and south of the new construction, the City approved the Project, finding that the Project is compatible with the surrounding neighborhood. The trial court denied Karney's petition for writ of mandate as to its challenge of the City's approval of a conditional use permit for the Project. Karney appeals. We affirm.[1]

## STATEMENT OF FACTS

### A.    The Playa Vista Neighborhood and Project Site

The Project site is located within a commercial office and industrial, low and medium-rise, mixed-use neighborhood. It sits at the intersection of Beatrice Street and South Jandy Place, both cul-de-sac streets and is zoned industrial M2-1. Some of the uses for which the neighborhood is appropriate include warehousing, distribution and storage, light manufacturing, and multi-family housing. Several commercial office and industrial buildings are located to the west, north, and southeast of the Project site, including two-story commercial office and industrial buildings to the east. A five-level parking structure is located adjacent to the Project site's northeastern side. There is a single-family residential neighborhood to the east and a five-story apartment building located on the southwestern side.

---

[1] Karney is the appellant, the City is the respondent, and N.S.B. is the real party in interest. N.S.B. joined the City's brief. (Cal. Rules of Court, rule 8.200(a)(5).)

**B.     N.S.B.'s Proposal**

In April 2016, N.S.B. filed an application with the City that included requests for (1) site plan review, (2) a conditional use permit for a "major" development project within the meaning of Los Angeles Municipal Code (LAMC) section 12.24, and (3) a conditional use permit for floor area ratio average (LAMC § 12.24W(19)).  The Project site contained two office buildings, one about 23,000 square feet and the other close to 88,000 square feet.  N.S.B. plans to demolish the smaller existing structure, retain the larger, and construct a new eight-story building with a height ranging from 30 to 135 feet, with an additional 20 feet in height permitted for housing rooftop mechanical equipment only.  The average height for the site will be 83 feet, taking into account the varying heights of the new building and the existing two-story building that will remain.  The Project's tallest elements are oriented away from the east and south, where single-family and multi-family uses are located.

The new building will include approximately 196,100 square feet of office space located on the fourth to eighth floors; a 2,500 square-foot café or restaurant with outdoor seating and smaller retail spaces on the ground floor; and 900 square feet of retail space on the second and third floors, amounting to a total building space of 199,500 square feet.  It will also include approximately 48,584 square feet of landscaping (e.g., trees, green space, etc.) and 47,198 square feet of hardscape area (e.g., courtyards, pathways, etc.) throughout the Project site and on the new building terraces on the upper levels, in addition to one and a half levels of subterranean parking and three and a half above ground parking levels.  This includes existing parking areas, which will be re-designed and upgraded.  The Project will be 269,277 square feet, including 69,777 square feet for the existing building and 199,500 square feet of new construction.[2]  Both the total floor area and the floor

---

[2] This figure does not include the floor area of the parking area, which is over 400,000 square feet, of which one and one-half levels are underground.

area to lot ratio (approximately 1.46:1) are lower than the maximum total floor area and floor area ratio permitted by the M2-1 zoning of the Project site (294,671 square feet and 1.5:1, respectively).[3]

In February 2017, N.S.B. filed an application seeking a lot line adjustment.

## C. The City's Preliminary Approval

In April 2017, the City's planning department prepared an initial study required by the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.), finding that a mitigated negative declaration (MND) would constitute sufficient compliance with CEQA. A public hearing was held in June 2017, at which Karney and a number of neighbors spoke against the Project. At the conclusion of the hearing, the planning commission adopted its recommendation for a MND and recommended to the City that it approve the conditional use permits.

In preparation for another public hearing scheduled for July 2017, the planning department prepared a recommendation report. It noted that although the new building would be taller and greater in mass than the immediately surrounding buildings, the project's height was compatible with existing zoning and floor area ratios in the vicinity. It also stated that the Project "provide[s] a mix of building scales with a single campus in keeping with the neighborhood properties." It also stated that "other buildings that fit the same context [as the Project] include the five-story residential building abutting the project site to the south with a permitted floor area ratio of 1.97:1, and a six-story commercial building located further [*sic*] south with a permitted floor area ratio of 2.0:1." The planning department report observed that "in recognition of the nearby single-family and multi-family uses, the Project's tallest elements are oriented away from the east and south." Additionally, the planning committee found that

---

[3] The Project as originally proposed was 20 percent larger in size and height but was reduced following public outreach.

the Project "employs design elements, including integrated landscaped terraces that break up building massing and add a significant amount of greenery" and that it incorporates ground-level setbacks that are landscaped and designed to be pedestrian-oriented. The report recommended that the City planning commission approve the conditional use, noting that "[e]xtensive conditions of approval are included herein to ensure compatibility with and prevent adverse impacts to adjacent properties and the surrounding neighborhood."

At the July 2017 hearing, Karney again spoke against the Project, arguing, among other things, that it is "completely out of scale with the neighborhood" and that it will cause a "tremendous amount of traffic." In support of the Project, staff for the city councilmember for the project area praised the Project, describing it as something that would enhance the area. At the conclusion of this hearing, the planning commission approved the Project, the use of a MND, the site plan, and the conditional use permits.

The City planning commission issued a letter of determination in August 2017, finding there is no substantial evidence that the Project would have a significant effect on the environment and that the Project was compatible with the surrounding neighborhood. The planning commission found that the Project "incorporates elements that enhance the built environment and integrate the project into the surrounding neighborhood," including landscaped terraces and ground-level pedestrian features such as seating and gathering spaces." It noted that "the surrounding area . . . is currently developed with a variety of commercial uses in many dated manufacturing buildings" and that the Project would be "preserving the designated land use patter[n] of the surrounding neighborhood." Consistent with the planning department recommendation report, it noted that there are other buildings in the "same context" with respect to height. Additionally, the planning commission found that the Project "concentrates its floor area to a single multi-story building, rather than distributing allowable floor area over the entire development site," thereby "reduc[ing] impacts to the predominately residential street face," and that the building's

5

varied mass "enhance[s] its pedestrian scale from the street."  It concluded that "the project provides for an arrangement of uses, buildings, structures, open spaces and other improvements that are compatible with the scale and character of the adjacent properties and surrounding neighborhood."

## D.     Karney Sought Administrative Relief

In September 2017, Karney appealed to the city council, contending the proposed MND was inadequate as a matter of law, that the Project was not compatible with the character of adjacent properties, and that the Project violated both state and city laws.  In January 2018, the city council's Planning and Land Use Management (PLUM) committee held a hearing on Karney's appeal, at which Karney testified.  At the conclusion of the hearing, the PLUM committee moved to deny Karney's appeal.  In February 2018, the city council adopted the PLUM committee's report, and the mayor thereafter approved the city council's action.

## E.     Karney's Petition for Administrative Mandate

In March 2018, Karney filed a petition for administrative mandate (Code Civ. Proc., § 1094.5), contending the MND was inadequate under CEQA, that the City erred in finding the Project was compatible with the neighborhood, and that the approval of the Project violated other state and city laws.  After the City granted N.S.B.'s lot line adjustment (in November 2018), Karney filed a second mandate petition, and the two petitions were consolidated.  In September 2019, after briefing and a hearing, the trial court denied the lot line petition and, as to the original petition, granted it in part and denied it in part.  It found that the MND was deficient with regard to traffic impacts, noise, and aesthetics and that an environmental impact report was required for those issues, but it upheld the MND as adequate in all other respects.  The court found that the City's conditional use permit findings were supported by substantial evidence.

Karney appeals from the final judgment entered in January 2020 and challenges the City's findings with respect to its issuance of a conditional use permit.

6

# DISCUSSION

## I. Standard of Review

The approval of a conditional use permit by the City is an "administrative, quasi-judicial act[ ] reviewable pursuant to Code of Civil Procedure section 1094.5 which requires a court to determine whether the administrative agency has abused its discretion. Abuse of discretion is established where the agency has not proceeded in the manner required by law, has made a decision unsupported by the findings, or has made findings unsupported by substantial evidence in light of the whole record." (*Las Virgenes Homeowners Federation, Inc. v. County of Los Angeles* (1986) 177 Cal.App.3d 300, 305.) "[A]n appellate court reviewing a trial court's ruling on administrative mandamus applies a substantial evidence standard. [Citations.] . . . [¶] Under the substantial evidence test, the agency's findings are presumed to be supported by the administrative record and the appellant challenging them has the burden to show they are not." (*SP Star Enterprises, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 459, 469.)

We defer to an agency's factual findings unless no reasonable person could have reached the same conclusion based on the evidence before it. (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 514; see *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515.)

"We exercise independent judgment on legal issues, including the interpretation of municipal ordinances. [Citation.] 'Courts interpret municipal ordinances in the same manner and pursuant to the same rules applicable to the interpretation of statutes.' [Citation.] That said, a city's interpretation of its own ordinance is ' "entitled to deference" in our independent review of the meaning or application of the law.' [Citations.]" (*Harrington v. City of Davis* (2017) 16 Cal.App.5th 420, 434.)

## II. The City Applied the Correct Legal Standard

LAMC section 12.24U(14)(b)(1) allows the City to grant a conditional use permit to a properly zoned " 'Major' development," such

as the Project, if it "provides for an arrangement of uses, buildings, structures, open spaces and other improvements that are compatible with the scale and character of the adjacent properties and surrounding neighborhood." Karney contends the City applied the incorrect legal standard in concluding that the Project satisfies the requirements of subdivision U(14)(b)(1). Karney further argues that the case presents a "pure question[ ] of law" to which we must exercise our independent judgment on appeal. According to Karney, the City erred as a matter of law by failing to employ a purported "compatibility" test as required by *Muzzy Ranch Co. v. Solana County Airport Land Use Com.* (2008) 164 Cal.App.4th 1 (*Muzzy Ranch*). We disagree.

In *Muzzy Ranch, supra,* 164 Cal.App.4th 1, the Solano County Airport Land Use Commission adopted the Travis Air Force Base Land Use Compatibility Plan (Plan) to ensure that development around Travis would be compatible with aircraft activity at the base. (*Id.* at p. 4.) The Plan froze residential development on a large swath of private property in Solano County. (*Id.* at p. 5.) Muzzy Ranch, which owned thousands of acres of affected property, challenged the Plan. (*Ibid.*) Muzzy Ranch argued that the Plan for a military airport had to be " 'consistent with' " safety and noise standards in an Air Force air installation compatible use zone (AICUZ) study and that the Plan was not " 'consistent with' " the AICUZ study because it utilized lower noise standards. (*Id.* at pp. 8–9.) In analyzing the interpretation of "consistent with" in this context, our state's Supreme Court referenced various dictionary definitions. (*Id.* at p. 9.) However, it ultimately found that in order for the Plan to be consistent with the AICUZ study, the standards in the Plan only needed to be "compatible" with those in the AICUZ study, not identical to them. (*Ibid.*)

Contrary to Karney's assertions, *Muzzy Ranch* did not create a "compatibility test" requiring the City to consider whether a major development is " 'capable of existing together without discord or disharmony' " in the neighborhood in which it is proposed to be built. (*Muzzy Ranch, supra,* 164 Cal.App.4th at p. 9.) Rather, the language cited by Karney as a purported test was part of a dictionary definition

of "compatible" that was considered by the court in reaching the conclusion that a broader, rather than narrower, definition of "consistent with" was appropriate. (See *ibid*.) Thus, *Muzzy Ranch* not only fails to support Karney's contention that a mandatory "compatibility" test exists, but also belies the claim that this case involves questions of statutory interpretation subject to a de novo review. The "compatible with" language used in the municipal code at issue here was used in *Muzzy Ranch* to clarify the disputed language there, undermining Karney's claim that the phrase "compatible with" lacks clarity or requires interpretation.

As the trial court observed, the record provides evidence that the City "considered the scale and characteristics of the adjacent properties and surrounding neighborhood, including the nature, bulk, scale, and height of the surrounding uses" in finding that the Project was compatible with the scale and character of the adjacent properties and surrounding neighborhood. This is the proper standard to consider under LAMC section 12.24U(14)(b)(1). We therefore reject Karney's contention that the City failed to apply the correct legal standard.

## III. The City's Conditional Use Permit Findings Were Supported by Substantial Evidence

Karney contends that substantial evidence did not support the City's conclusion that the Project's "towering, 155-foot[ ]tall, 600,000 square-foot" office building could " 'coexist' " with the surrounding low-height buildings. We disagree.

As a preliminary matter, the figures on which Karney repeatedly relies in characterizing the Project distort its dimensions. The record shows that the proposed new buildings would range in height from one to eight stories and approximately 30 to 135 feet, with an additional 20 feet in height permitted for mechanical equipment only. Thus, while the Project has a maximum possible height of 155 feet, that is not the height of the entire Project. Moreover, the record shows that the total square footage of the Project, including the existing building, is 269,277 square feet. Karney's square footage claim includes over 400,000 square feet of parking area, approximately a third of which is

underground. Karney does not point to any authority supporting that it is customary to include parking area in the total floor area. Rather, the record supports the inference that the Project would not have satisfied the total floor area limitation for the M2-1 zone neighborhood if the parking floor area were properly included.

Karney also contends the Project is surrounded by buildings with a median height of 26.5 feet and an average height of 34 feet. The City objects that the documents on which Karney relies in making this claim were submitted by Karney during the public comment period and do not explain how the buildings to which the Project is compared were chosen or whether any relevant buildings in the area were excluded. Even setting aside these concerns, the City was not limited to considering only average heights in assessing the question of compatibility. Indeed, relying on averages alone may obscure the fact that a neighborhood consists of buildings of many varied heights, as appears to be the case here.[4] The record provides evidence that there are other buildings that "fit [within] the same context" as the Project in the surrounding area, including a five-story residential building abutting the project to the south and a six-story commercial building located farther south.

The City concluded that the project components, including its location, size, height, operations and other significant features, have been appropriately designed to provide for compatibility with adjacent properties and the surrounding neighborhood. The record supports the conclusion that efforts were made to integrate the Project into the existing neighborhood and to minimize impacts on residential areas, including by varying the height and floor plate size between design elements, orienting the tallest elements away from where single-family and multi-family uses are located, employing design elements that break up building massing, and incorporating ground level setbacks

_____

[4] In responding to the City's reference to the average height of the Project, Karney seems to acknowledge that the use of average heights can be "somewhat suspect" and "misleading" because it masks individual differences.

that are landscaped and pedestrian oriented. We conclude that the challenged finding that the Project is "compatible with the scale and character of the adjacent properties and surrounding neighborhood" was supported by substantial evidence.

In its challenge to the City's finding, Karney repeatedly argues that the City purportedly failed "to address the huge height and mass disparity between the Project[ ] . . . and the adjacent and surrounding buildings." However, as discussed above, the City did recognize that the larger building was taller than nearby buildings but found that there were buildings in the same context in terms of height in the surrounding area and that measures had been taken to reduce the visual impact of the height on residential areas. Moreover, contrary to Karney's assertions, the mere fact the Project is taller than adjacent buildings is not determinative.

Karney relies on *Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332 to argue that "a *single*, significant inconsistency is sufficient to render a project 'incompatible.' " However, *Families Unafraid* does not stand for that proposition. *Families Unafraid* concerned whether the designation of a proposed development as low-density residential was consistent with a draft general plan that required that areas with that designation be " 'restricted to those lands *contiguous to* [c]ommunity [r]egions and [r]ural [c]enters to provide for a transition of density into the [r]ural [r]egions.' " (*Id*. at p. 1340, italics added.) The county board of supervisors found the project consistent with the general plan (*id*. at p. 1337), notwithstanding the undisputed evidence that no part of the project site was contiguous to a community region or a rural center. (*Id*. at p. 1340.) The trial court ruled in the county's favor. (*Id*. at p. 1335.) The appellate court reversed, finding, "It is readily apparent that the [low-density residential] designation for [the project] is inconsistent with the [d]raft [g]eneral [p]lan policies . . . governing contiguous development and rural separation." (*Id*. at p. 1341.) The court further noted that the "inconsistency with th[e] fundamental,

11

mandatory and specific land use policy is clear—this is not an issue of conflicting evidence." (*Id.* at p. 1342.)

The case before us is distinguishable from *Families Unafraid to Uphold Rural etc. County v. Board of Supervisors*, *supra*, 62 Cal.App.4th 1332. Here, in contrast to the mandatory and specific requirement that the low-density residential development be contiguous to certain already developed areas, the language in LAMC section 12.24U(14)(b)(1) is discretionary and multi-faceted. It provides that the City may grant a conditional use permit to a properly zoned " 'Major' development" if it "provides for an arrangement of uses, buildings, structures, open spaces and other improvements that are compatible with the scale and character of the adjacent properties and surrounding neighborhood." Further, whether the Project is "compatible with the scale and character of the adjacent properties and surrounding neighborhood" is not clear and undisputed but contested by the parties and real party in interest. This is not a case where the undisputed facts plainly failed to support the determination made by a local governing body.

*San Bernardino Valley Audubon Society, Inc. v. County of San Bernardino* (1984) 155 Cal.App.3d 738, on which Karney also relies, is similarly distinguishable. The county general plan at issue required protection of " 'beneficial, rare or endangered animals and plants with limited or specialized habitats,' " and the planning staff recommended rejecting the project because it would have " 'an adverse impact on biota and cultural resources which cannot be mitigated.' " (*Id.* at p. 753.) The county board of supervisors nevertheless granted site approval. (*Id.* at p. 746.) The appellate court held that the trial court had correctly found that the record did not contain substantial evidence to support the board's determination that the project was consistent with the general plan. (*Ibid.*) Once again, the language of the LAMC at issue is more discretionary than the language in the general plan in *San Bernardino*, and the City's determination here was not contrary to staff recommendations. Rather, the staff report recommended

12

approving the conditional use permit, and a member of the staff reiterated its finding of compatibility at the public hearing.[5]

We also reject Karney's contention that the City's determination improperly considered the Project's compliance with neighborhood zoning requirements. As the City points out, the cases on which Karney relies in arguing that this was inappropriate instead stand for the proposition that the mere fact that a use is permitted under a site's zoning requirements does not guarantee an entitlement to develop property with that use. (See *Concerned Dublin Citizens v. City of Dublin* (2013) 214 Cal.App.4th 1301, 1314 [real party in interest was "not automatically entitled to develop commercial property simply because such use would comply with zoning requirements"]; *Wesley Investment Co. v. County of Alameda* (1984) 151 Cal.App.3d 672, 678 ["The fact that the site in question is in a zone where a retail store may be lawfully maintained does not diminish the county's power to determine that a particular development is not suitable for that location"].) If anything, this proposition emphasizes the City's discretion to determine whether a development, which is proposed to be built in an appropriately zoned location, is appropriate.

Moreover, the record does not support the contention that the Project's zoning classification was the sole justification for the City's approval of the conditional use permit in this case. The Project's zoning was noted in conjunction with the findings that "the surrounding area . . . is currently developed with a variety of commercial uses in many dated manufacturing buildings" and that the Project would be "preserving the designated land use patter[n] of the surrounding

---

[5] Karney also relies on *Kalnel Gardens, LLC v. City of Los Angeles* (2016) 3 Cal.App.5th 927, which upheld the City's decision to halt a previously approved housing project based in part on its determination that it violated requirements of the California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq.). This decision, which focused on the issue of whether the Coastal Act took precedence over the various housing density statutes, is factually and legally distinguishable.

neighborhood."  Further, the City's findings included that the Project would provide amenities to surrounding businesses and residences; that it fit into the "same context" as other buildings in the area with respect to height, in that there are nearby structures that are five and six stories tall; that elements such as landscaped terraces and pedestrian seating areas integrated the Project into the neighborhood and "enhanced the built environment"; and that the varied mass and the orientation of the Project reduced impacts on residential areas and enhanced pedestrian scale.

In sum, Karney has failed to establish that the City's findings under LAMC section 12.24U(14)(b)(1), which are entitled to significant deference, were not supported by substantial evidence.

## DISPOSITION

The judgment is affirmed.  The City is awarded its costs on appeal.

NOT TO BE PUBLISHED

MORI, J.\*

We concur:

ROTHSCHILD, P. J.

CHANEY, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14