Filed 10/15/25  County of Riverside v. City of Moreno Valley CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

COUNTY OF RIVERSIDE et al.,

      Plaintiffs and Respondents,

v.

CITY OF MORENO VALLEY,

      Defendant and Appellant;

LAWRENCE FAMILY TRUST, et al.,

      Real Parties in Interest and
Appellants.

E085031

(Super.Ct.No. CVRI2301559)

OPINION

APPEAL from the Superior Court of Riverside County.  Harold W. Hopp, Judge.

Affirmed.

Elkins Kalt Weintraub Reuben Gartside, John M. Bowman, and Jackson D.

McNeill; Law Offices of Quintanilla & Associates, Steven B. Quintanilla, Gulan F.

Tahir, for Defendant and Appellant and Real Parties in Interest and Appellants.

1

Best Best & Krieger, Amy E. Hoyt, Sarah E. Owsowitz, and Tiffany M. Michou, for Plaintiff and Respondent, March Joint Powers Authority.

Minh C. Tran, County Counsel, G. Ross Trindle III, and Melissa R. Cushman, for Plaintiff and Respondent, County of Riverside.

In 2023, defendant City of Moreno Valley (City) approved the Heacock Logistics Parking Lot Plot Plan (the Project), which proposes the construction of a 24-hour-a-day paved parking lot for 194 cars on land located at the end of an active March Air Reserve Base/Inland Port Airport (March ARB Airport) runway and owned by real parties in interest Lawrence Family Trust (the Trust) and Douglas "David" Schiepe, Trustee (collectively Real Parties).[1]  As the lead agency for the Project under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000, *et seq*.), the City passed a resolution adopting a mitigated negative declaration (MND) for the Project (Pub. Resources Code, § 21064.5; Cal. Code Regs., tit. 14, § 15369.5).  Plaintiffs and respondents March Joint Powers Authority (March JPA) and County of Riverside (County) (collectively Respondents) challenged the City's approval of the Project via petitions for writ of mandate and complaint for declaratory and injunctive relief, asking the superior court to order the City to set aside the MND and approvals to the Project and refrain from granting any further approvals or permits for the Project unless the City and Real Parties (collectively Appellants) comply fully with the requirements of CEQA,

---

[1]  Douglas "David" Schiepe is the sole trustee of the Trust.

2

California Planning and Zoning Law, and the City's General Plan and Municipal Code. The court granted Respondents' writ petitions.

On appeal, Appellants contend the superior court (1) erroneously interpreted the State Aeronautics Act (SAA) (Pub. Util. Code § 21001 et seq.), ruling on an issue that was not presented during the administrative proceedings; (2) improperly substituted its judgment for the City's by ruling the Project was inconsistent with applicable land use plans; and (3) erred in concluding the City was required to prepare an Environmental Impact Report (EIR). We reject these contentions and affirm.

## I. PROCEDURAL BACKGROUND AND FACTS[2]

### A. *The Project.*

In or about 2012, Mr. Schiepe purchased a 9.14-acre vacant lot (Property) on Heacock Street in the southwest portion of the City, located at the end of a March ARB Airport runway, and transferred it to the Trust. Mr. Schiepe purchased the Property from the Riverside County Tax Auction and was told by the planning department that he could only use it for agricultural purposes. Surrounding land uses include a vacant land and industrial uses to the north and east, the Perris Valley Storm Drain to the south, and the March ARB Airport to the northwest. The Property is subject to the Moreno Valley

---

[2] Respondents request this court take judicial notice of the United States District Court, Central District of California, Western Division's Order Granting Joint Stipulation to Stay Proceedings Pending Final Outcome of State Court Action entered on October 7, 2024, in Case No. 2:24-cv-01280-HDV-JC entitled *United States of America v. Lawrence Family Trust and David Schiepe*. Appellants oppose the request on the ground the order has no bearing on this court's analysis and disposition of the issues presented. We agree with Appellants and deny the request for judicial notice.

Industrial Area Plan, Specific Plan 208 (SP208), which allows "industrial/business support uses" of the land, and is located within an area designated by SP208 as Zone A, the Clear Zone, of the March Air Reserve Base/Inland Port Airport Land Use Compatibility Plan (ALUC Plan). In May 2021, the Trust applied to the City to develop the Property into a parking lot for employees of the numerous logistics businesses in the area.

      *B. Land Use Plans That Govern the Project's Site.*

      *1. <u>The ALUC Plan</u>*

An ALUC plan is a "State-required, long-range master plan that reflects the anticipated growth of an airport over a 20-year time period. State law requires general and specific plans to be consistent with any [ALUC plan] affecting the City." In 2014, Riverside County ALUC (ALUC) adopted the ALUC Plan, which includes compatibility criteria and maps for influence areas of the March Air Reserve Base/Inland Port Airport. The ALUC Plan is primarily based upon the United States Air Force's 2005 Air Installations Compatible Use Zones Study (2005 AICUZ) for March ARB Airport. The 2005 AICUZ is intended to promote compatible land uses in nongovernment areas adjacent to military airfields, and it is designed to aid in the development of local planning mechanisms that will protect public safety and health and preserve March ARB Airport's mission and operational capabilities; it was updated in 2018 (2018 AICUZ).

The Property is located in an area identified by the ALUC Plan as Zone A, the Clear Zone. The Clear Zone is the "square area beyond the end of the runway and

4

centered on the runway centerline extending outward for 3,000 feet." It is a critical area where vital aviation maneuvers occur for take-off and landing and is considered dangerous because 27.4 percent of all aircraft accidents occur there. Due to these safety concerns, the 2005 AICUZ and 2018 AICUZ both specify a Clear Zone "should remain undeveloped" and automobile parking is not compatible with the Clear Zone.

The ALUC Plan speaks to these dangers, identifying the Clear Zone as a "Very High" Risk Level, and is primarily based upon the United States Air Force's 2005 AICUZ. Thus, properties within the Clear Zone are "[g]enerally on air base property or controlled by easements." The ALUC Plan's Basic Compatibility Criteria Table MA-2 also prohibits all assemblages of people, non-aeronautical structures, and storage of hazardous materials in the Clear Zone. The ALUC Plan notes that a Clear Zone or Zone A requires an avigation easement that must be dedicated to the March Inland Port Airport Authority and the United States of America.

2. *Moreno Valley Industrial Area Plan (SP208)*

The Project site is within SP208, adopted by the City in June 1989. SP208 covers approximately 1,540 acres in the southwestern end of the City, including 50 acres within the Clear Zone. SP208 affirms that the Clear Zone was established to be consistent with the March ARB Airport's safety regulations and is subject to the most recent AICUZ. Per SP208, the Clear Zone "has a high accident potential and requires that no structures be allowed in this area." Further discussion of the Clear Zone notes that it is "planned for passive, non-structure uses, primarily agriculture." While SP208 notes that the

5

compatible uses in the Clear Zone are limited to roads, agriculture, and open space, one sentence states: "In accordance with the Study[,] land uses are restricted to open space, agricultural, automobile parking and roads." However, the 2005 AICUZ and 2018 AICUZ both identify a parking lot as an incompatible use.

### 3. *Moreno Valley General Plan 2040*

Under the City's General Plan 2040 (General Plan), adopted in June 2021, the Project site is designated as Open Space. Per the General Plan, Open Space is to be substantially unimproved and utilized for uses such as outdoor passive recreation, preservation of natural resources, livestock grazing, and cultivating crops. It does not identify parking as an appropriate use. According to the General Plan, a "portion of Heacock Street is located within an area that is currently identified as the Clear Zone." Thus, it requires conformity to the ALUC Plan, and incorporates by reference: the ALUC Plan, the City's airport compatibility zoning overlay, the 2018 AICUZ, and applicable Air Force and Department of Defense (DOD) instructions. Due to those documents' restrictions, the General Plan cautions that "future improvements of the street segment in the Clear Zone may be constrained."

### C. *The Project Site Is Subject to a Clear Zone Easement*

According to the Air Force Instruction AFI 32-7063, dated December 18, 2015, "[T]he Clear Zone warrants special attention. The potential for accidents is so high that the land use restrictions necessary to ensure compatibility would prohibit reasonable economic use of the land. Therefore, it is DOD and AF policy to own the land within the

Clear Zone, or control the land through restrictive use easements.  Although primarily designed to protect people on the ground from accident potential, the area should remain as clear as possible to minimize objects that could increase damage should an aircraft accident occur."  Thus, in 1984 the Air Force paid $77,090 to acquire a recorded perpetual easement on the Property (Clear Zone Easement).  It grants the United States the "right to prohibit all land uses other than the following:  a. agriculture; b. grazing . . . ; c. permanent open space; d. existing water areas; e. rights-of-ways for fenced two-land highways . . ., and single tract railroads; and f. communications and utilities rights-of-ways."

   D.  *The City's Environmental Review of the Project.*

   As required by CEQA and the CEQA Guidelines, the City, with the assistance of qualified consultants, prepared an initial study of the Project (Initial Study) to determine whether it may have significant environmental effects.  The Initial Study concluded the Project would not have any significant impacts on the environment with the imposition of specified mitigation measures.  With respect to the Project's potential impacts on public safety, the Initial Study acknowledged the Project's site is within Zone A of the March ARB Airport and within SP208's Clear Zone, but concluded any potential impacts would be less than significant because "there are no structures, assemblage of people, objects exceeding FAA height limits, nor storage of hazardous materials proposed on the Project site."  The Initial Study also determined that the Project was consistent with the

7

ALUC Plan, SP208, and other applicable land use plans. Accordingly, an MND was prepared and circulated for public comment.

During the public review period, March JPA submitted comments noting defects in the MND and urging the City's Planning Commission (Planning Commission) to address aviation accidents within the Clear Zone and the existence of the controlling Clear Zone Easement. It also requested the preparation of an EIR. Other public agencies and officials, including the County, Riverside ALUC, March ARB, the City of Norco, the City of Perris, the Air Force, Congressmen Ken Calvert and Mark Takano, and State Senator Richard D. Roth, submitted comments noting MND defects, including public health and safety hazards and conflicts with land use plans, and urging the Planning Commission to deny the Project or prepare an EIR. In response to these comments, the public hearing, originally set for October 27, 2022, was continued to December 22.

*E. The MND and Project Approvals*

Subsequently, the Planning Commission considered the Project during its meeting on December 22, 2022. The Planning Commission's staff report recommended conditional approval. According to the report, the Project had "been considered by all appropriate agencies within and outside of the City, consistent with the standard review process required for these types of development applications." Nonetheless, a number of those agencies opposed the Project and their representatives testified against it during the public hearing. The opposing agencies argued that (1) an EIR was required due to the Project's alleged public safety impacts and alleged inconsistency with various adopted

8

plans; (2) the Property is subject to the Clear Zone Easement; (3) automobile parking is not a permitted use of the Property under the applicable land use regulations; and (4) the Property should remain undeveloped. The Planning Commission also heard from representatives of the Trust in support of the Project. After considering the staff report and the public testimony, the Planning Commission voted unanimously (5 to 0) to adopt the MND and approve the Project subject to 102 conditions of approval.

On February 21, 2023, the City Council held a public hearing and approved the Project by a vote of 3 to 2.

*F. The Superior Court Proceedings*

On March 27, 2023, March JPA and the County separately filed petitions for writ of mandate under CEQA together with complaints for declaratory and injunctive relief asking the superior court to set aside its resolution challenging the Project approvals. The cases were later consolidated for trial. The parties submitted briefs to the superior court.[3] A hearing was held on May 22, 2024. After taking the matter under submission, the court issued an order granting the petitions. The court found substantial evidence that the Project may have significant environmental effects since (1) people will be assembling in the parking lot 24 hours per day, seven days per week, driving on and off the lot and waiting for shuttles, (2) hazardous materials will be stored in the form of fuel within each of the nearly 200 vehicles parking on the lot, (3) ignition of the parked vehicles as a result of an aircraft crash and fire will result in the release of toxic fumes, and (4) there could be

---

[3] On March 6, 2024, the United States filed an amicus brief in this case, which the superior court considered.

9

a mass casualty event if the crash occurs when many people are on the lot.  The court further found that the Project is inconsistent with SP208 because the 2018 AICUZ states that automobile parking is not compatible with the Clear Zone, and the City violated the SAA by relying on SP208, which was never reviewed by ALUC.  Appellants appeal.

## II.  DISCUSSION

Appellants challenge the superior court's conclusions that (1) the City violated the SAA by relying on SP208 to approve the Project, (2) the Project is inconsistent with applicable land use plans, and (3) the City was required to prepare an EIR.

### A.  *Violation of SAA*

Appellants begin by arguing there was no violation of the SAA.  Still, even if there was, Respondents failed to present this issue to the City during the administrative proceedings.  As we explain, we disagree.

### 1.  *Exhaustion doctrine*

According to Appellants, Respondents failed to present their SAA contentions to the City and therefor failed to exhaust their administrative remedies before seeking relief from the superior court.  Specifically, they argue "vague references to the SAA made by representatives of ALUC and the Air Force failed to put the City on notice of (or allowed the City to respond to) [the issue of violating the SAA by not submitting the Project, SP208, or both to ALUC for a consistency determination] and were clearly insufficient to preserve the issue for judicial review."  We disagree.

10

During the Initial Study, several people raised the issue the City had not sought ALUC's approval of the Project, simply relying on SP208 (a specific plan that was less protective than the ALUC Plan) which ALUC had not reviewed. The March JPA informed the Planning Commission that the Project is incompatible with AICUZ and is subject to ALUC and the Clear Zone Easement. The Air Force concurred. Paul Rull, Director of ALUC, expressed concerns that the Project "will have significant impacts to the public health and safety based on its use as a parking lot and its location within" the Clear Zone, and is not consistent with the General Plan and Zoning Code Amendments, which require consistency with the ALUC Plan. At the Planning Commission's public hearing, Simon Housman (formerly Chair of ALUC) explained ALUC had not reviewed the Project because it was informed the Project fell under the General Plan, which was found to be consistent with the ALUC Plan. Subsequently, ALUC discovered the Project was not relying on the General Plan, but on SP208, which is not consistent with ALUC and not exempt from the more stringent requirements of the ALUC Plan. The Planning Commission approved the Project and sent it to the City Council.

Prior to the City Council's hearing, legal counsel for March ARB alerted the City that the Project was not consistent with its General Plan, and Council members could not rely on SP208 to approve the Project. Counsel pointed out that (1) state law "requires that local government's General Plans include land use elements that consider the impact of new growth on military readiness," (2) SP208 is not consistent with the General Plan because SP208 references "an outdated, superseded AICUZ study to state that automobile

11

parking is one of a few land uses not prohibited for the Clear Zone," (3) "finding that [SP208] eliminates the need to coordinate and ensure compatibility of the proposed use in the Clear Zone is not consistent with the General Plan," and (4) "a reasonable interpretation of both the General Plan and [SP208] finds that proposed land uses in the Clear Zone that change from passive to active use—such as a parking lot with hundreds of spaces—require analysis of any proposed new use for safety considerations and compatibility with March ARB."

More specifically, legal counsel referenced Attorney General's opinion #03-0805 from 2004, which held that an ALUC may not exempt a city's specific plan from complying with the more stringent compatibility standards for land use, development density, and development intensity in the vicinity of a public use airport. The opinion provides, "'In light of the elaborate procedures set forth in [the Aeronautics Act (SAA)] for identifying and resolving inconsistencies between a specific plan and an [ALUC P]lan, it is apparent that the Legislature did not intend to authorize a commission to grant "exemptions" for a specific plan with less stringent standards than a compatibility plan.' Moreover, there is nothing in the [SAA] giving a commission authority to exempt a specific plan. To allow exemptions would not promote the legislative goals of 'orderly development' and discouraging incompatible land uses near existing airports. Similarly to the way an airport commission cannot exempt a specific City plan from the airport land use plan requirements, the City cannot do that either, and is bound by the [ALUC Plan]." Citing Public Utilities Code sections 21670 and 21676, counsel argued that since

ALUC found the Project was inconsistent with the ALUC Plan, further procedural requirements were triggered under state law. These concerns were reiterated at the City Council's hearing.

Given the above, we conclude Respondents did raise the issue of the City's violation of the SAA prior to approval of the Project.

2. *Violation of the SAA*

a. Applicable legal principles

The SAA provides for the establishment of ALUC's in California counties "to protect public health, safety, and welfare by ensuring the orderly expansion of airports and the adoption of land use measures that minimize the public's exposure to excessive noise and safety hazards within areas around public airports to the extent that these areas are not already devoted to incompatible uses." (Pub. Util. Code, § 21670, subd. (a)(2).) Each ALUC must include at least two aviation experts. (Pub. Util. Code, §§ 21670, subd. (b)(3), 21670.1, subd. (b).) ALUC's powers and duties include: "(a) To assist local agencies in ensuring compatible land uses in the vicinity of all new airports and in the vicinity of existing airports to the extent that the land in the vicinity of those airports is not already devoted to incompatible uses. [¶] (b) To coordinate planning at the state, regional, and local levels so as to provide for the orderly development of air transportation, while at the same time protecting the public health, safety, and welfare. [¶] (c) To prepare and adopt an airport land use compatibility plan [an ALUC plan] pursuant to Section 21675. [¶] (d) To review the plans, regulations, and other actions of

13

local agencies and airport operators pursuant to Section 21676." (Pub. Util. Code, § 21674.) Incompatible uses may continue to exist around airports where they existed before the SAA, but the goal is "to prevent the creation of new noise and safety problems." (Pub. Util. Code, § 21670, subd. (a)(1).)

ALUC's have jurisdiction over the areas around civilian and military airports. (Pub. Util. Code, § 21675, subds. (a), (b).) ALUC plans provide specific land use and compatibility requirements for ensuring that new growth in areas around airports safeguards the public near airports. (Pub. Util. Code, §§ 21674, 21675.) ALUC plans are "multijurisdictional general plan[s] [that] trump the land use planning authority that affected jurisdictions might otherwise exercise through general and specific plans or zoning." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 384-385 (*Muzzy Ranch 2007*).) While authority over land use decisions for an area covered by an ALUC Plan is shared between the local ALUC, the city, the county, and local agencies are subject to the SAA's airport land use laws and ALUC's authority. (Pub. Util. Code, §§ 21670, subd. (a)(2), 21676, subd. (b).) Safety and noise standards in an ALUC plan for any military airport "shall be consistent with the safety and noise standards in the [AICUZ] prepared for that military airport." (Pub. Util. Code, § 21675, subd. (b).) In other words, the safety and noise standards in the ALUC plan need not be identical to those in the AICUZ, but they must be compatible. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2008) 164 Cal.App.4th 1, 11 (*Muzzy Ranch 2008*).)

An ALUC determines whether a city's general plan, specific plans, and amendments thereto, are consistent or inconsistent with the applicable ALUC plan. (Pub. Util. Code, § 21676, subds. (a), (b).) If ALUC finds the proposed action inconsistent, the local agency may only overrule ALUC if, after a public hearing, it votes to do so by a two-thirds vote and makes findings, supported by substantial evidence, that the project protects public health, safety, and welfare and minimizes public exposure to excessive noise and safety hazards. (Pub. Util. Code, § 21676, subd. (b).) Because ALUC plans trump specific plans, the "city must amend its . . . specific plans as necessary to keep them consistent with an applicable [ALUC] plan." (*Muzzy Ranch 2007*, *supra*, 41 Cal.4th at p. 384, fn. omitted; see Gov. Code, § 65302.3.)

b. Analysis

Here, SP208 was adopted in June 1989 and last amended in 2013, However, there is no indication that it, or any amendment thereto, was reviewed and approved by Riverside ALUC. Public Utilities Code, section 21676, subdivision (a), in relevant part, provides, "Each local agency whose general plan includes areas covered by an [ALUC plan] shall, by July 1, 1983, submit a copy of its plan or specific plans to the airport land use commission. The commission shall determine by August 31, 1983, whether the plan or plans are consistent or inconsistent with the airport land use compatibility plan." Assuming for the sake of argument that Public Utilities Code, section 21676, subdivision (a), "by its own terms . . . only applies to specific plans in existence before July 1, 1983," and SP208 was adopted after 1983, the ALUC Handbook states that the

15

City is required to refer "any proposal to adopt or *amend a local plan* to the ALUC for review if the proposal involves land within an airport influence area defined by the ALUC." (Pub. Util. Code, § 21676, subd. (b).) The City never sought review of any of the amendments to SP208. Having failed to submit SP208, or any of its amended versions, to ALUC for a consistency determination, the City violated the SAA.

In contrast to SP208, the General Plan, and section 9.07.060 of the Moreno Valley Municipal Code (Section 9.07.060),[4] both adopted in the summer of 2021, were reviewed and approved by ALUC. Both were found to be consistent with the ALUC Plan upon the adoption of specified changes, including requiring areas within the Clear Zone to be consistent with the underlying Airport Compatibility Zone and the Air Force Instruction 32-7063, which addresses Air Force policies on land use compatibility in accordance with the DOD Instruction No. 4165.57.

Regarding the Project, there were two approaches for it to be reviewed for consistency with the ALUC Plan. Under the first approach, if ALUC *had not previously*

---

[4] Section 9.07.060, entitled Airport Land Use Compatibility Plan, establishes and implements "the requirements of the [ALUC Plan] that affects land uses within the City." "The provisions of the [ALUC Plan] shall apply in addition to the provisions of the underlying district. If there are inconsistencies between the underlying zone and the [ALUC Plan], the [ALUC Plan] shall take precedence." Moreover, section 9.07.060 recognizes that "the [ALUC Plan] may be more restrictive than what would otherwise be allowed per City zoning designation applicable to" property within an airport compatibility zone. When this is the case, proposed uses and development on such property "must be determined to be consistent with, and comply with the compatibility criteria of the applicable compatibility zone and [the ALUC Plan,]" in addition to "complying with the zoning requirements of this title." Section 9.07.060 references the ALUC Plan Table MA-1, which establishes the criteria for determining whether a proposed project is consistent with the ALUC Plan.

16

*reviewed and approved* the General Plan, Section 9.07.060, and any applicable specific plan (here SP208), then the City was required to submit all actions to ALUC for review. (Pub. Util. Code, § 21676, subd. (b).)  If ALUC determined the Project was not consistent with the ALUC Plan, the City could overrule the determination by a two-thirds vote, with specified findings.  (Pub. Util. Code, § 21676, subds. (b), (d).)  Under the second approach, if ALUC *had reviewed* the General Plan, Section 9.07.060, and any applicable specific plan (here SP208), *determined they were consistent* with the ALUC Plan, *and no amendments were proposed*, then ALUC could no longer require that "all actions" be sent to it for review.

In this case, only the General Plan and Section 9.07.060 had been previously reviewed by ALUC and found to be consistent with the ALUC Plan if the City adopted specified changes (including forbidding parking in the Clear Zone).  Unaware of SP208, Mr. Rull (ALUC Director) informed the City that it had jurisdiction to review the Project for consistency.  However, he warned that the Project was in the Clear Zone which "prohibits the assemblages of people, which would be generated by the parking lot. Historically, [ALUC] has viewed the use of parking spaces within Zone A Clear Zone as a prohibited use due to the potential hazard to flight.  Also . . . according to the Air Force 2018 AICUZ permitted land use table . . . parking lots are prohibited in the Clear Zone." Subsequently, ALUC learned that the City primarily relied upon SP208 to approve the Project.  Since SP208 had not been sent to ALUC, the City had to either send both the Project and SP208 to ALUC for review, or review the Project without relying on SP208.

17

(Pub. Util. Code, §§ 21676 subds. (b), (d), 21676.5, subd. (a).)  The City did neither.

Thus, it violated the SAA.  (Pub. Util. Code, §§ 21670, 21676.5.)

### B.  *Consistency with Applicable Land Use Plans.*

Appellants contend the superior court improperly substituted its judgment for the

City's by ruling the Project was inconsistent with applicable land use plans.  We disagree.

#### 1.  *Standard of review*

"We review a city's determination whether a project is consistent with its

[applicable land use plans] for abuse of discretion.  [Citation.] . . . [A] city's

determination of . . . consistency can only be reversed if, on the evidence before the city

at the time of the determination, 'no reasonable person could have reached the same

conclusion.'  [Citation.]"  (*Olen Properties Corp. v. City of Newport Beach* (2023) 93

Cal.App.5th 270, 277.)

#### 2.  *Analysis*

The land use policies at issue here are the ALUC Plan and AICUZ.  Appellants

contend the 2018 AICUZ does not forbid parking lots in the Clear Zone, and the City

correctly concluded the Project is consistent with the ALUC Plan because automobile

parking is not prohibited and the Project does not result in an assemblage of people, does

not include the storage of hazardous materials, does not constitute a non-aeronautical

structure, and reasonably qualifies as open land.  Appellants further assert the superior

court's ruling fails to explain how the City's conclusion was "arbitrary and capricious" or

18

how a reasonable person could not have found the Project was consistent with the ALUC Plan.

a. Automobile parking lots in the Clear Zone

Pursuant to Government Code section 65302.3, subdivision (a),[5] a city's general plan and any applicable specific plan must be consistent with the relevant ALUC Plan. Specific plans must also be consistent with a city's general plans. (Gov. Code, § 65454.) Here, the General Plan includes policies to mitigate safety impacts inherent near March ARB Airport by restricting the land uses allowed. More precisely, policy LCC.1-11 of the General Plan requires "new development be compatible with the standards for land uses, density and intensity specified in the [ALUC Plan]." Also, via policies S.4-1 and S.4-2, the General Plan seeks to "[l]imit hazards from flight operations in Moreno Valley through consistency with the [ALUC Plan]" and "review all projects within the March Air Reserve Base/Inland Port Airport Influence Area for conformance with the compatibility criteria outlined in the March ALUC Plan."

Section 9.07.060 creates a special use district overlay that applies the ALUC Plan requirements to the Project site and states that "[i]f there are inconsistencies between the underlying zone and the [ALUC Plan], the [ALUC Plan] shall take precedence." Section 9.07.060 notes that the compatibility zones for March ARB Airport are established per Table MA-1 within the ALUC Plan, and for discretionary actions proposed within the

---

[5] "The general plan, and any applicable specific plan prepared pursuant to Article 8 (commencing with Section 65450), shall be consistent with the plan adopted or amended pursuant to Section 21675 of the Public Utilities Code." (Gov. Code, § 65302.3, subd. (a).)

Clear Zone, the proposed use and/or development must meet "the compatibility criteria of the [ALUC Plan and] be consistent with current Air Force Guidance including: [¶] a. [DOD] Instruction 4165.57 for [AICUZ], March 12, 2015, or as amended, and [¶] b. Air Force Instruction AFI 32-7063 for [AICUZ] Program, December 18, 2015, or as amended[, s]pecifically AFI 32-7063, Table A.2.1 of Attachment 2 - Land Use Compatibility Recommendations . . . . [¶] c. Where a discretionary action is proposed within . . . [a] Clear Zone, the Department of the Air Force, 452d Air Mobility Wing (AFRC) March Air Reserve Base shall be consulted to determine whether the proposed discretionary action is consistent with the Air Force Guidance referenced above. Such consultation would be in addition to, and shall not be in lieu of requirements of the [ALUC Plan], or any review for airport land use compatibility that may be required by the Riverside County ALUC."

SP208 acknowledges (1) the Clear Zone is located in an area identified in the AICUZ as "required for public safety due to the high accident potential," and (2) AICUZ restricts uses in the Clear Zone to "passive, non-structural uses, primarily agriculture." However, SP208 also states that "[i]n accordance with the [AICUZ] Study land uses are restricted to open space, agricultural, automobile parking and roads."

As previously noted, Public Utilities Code section 21675, subdivision (b), requires an ALUC Plan be consistent with the safety and noise standards identified in the applicable AICUZ. To be consistent, the ALUC Plan must be "at least as protective" of military operations at the military airport as the AICUZ requires. (*Muzzy Ranch 2008*,

20

*supra*, 164 Cal.App.4th at p. 11.)  The 2018 AICUZ identifies the Clear Zone and states that it "is required for all active runways and should remain undeveloped."  Since "most uses [in the Clear Zone] are incompatible with military aircraft operations," the Air Force, where possible, acquires real property interests in the land to "ensure incompatible development does not occur."  Appendix A of the AICUZ Study, Table A-1 (Land Use Compatibility Recommendations in APZs and CZs) recommends "N" (or "No") for automobile parking in the Clear Zone.  However, footnote 1 to Table A-1 states that a "'Yes' or a 'No' designation for compatible land use is to be used only for general comparison.  Within each, uses exist where further evaluation may be needed in each category as to whether it is clearly compatible, normally compatible, or not compatible due to the variation of densities of people and structures.  In order to assist air installations and local governments, general suggestions as to [Federal Aviation Regulations (FARs)] are provided as a guide to density in some categories. . . ."

Appellants assert that since the ALUC Plan does not incorporate the AICUZ Study by reference or otherwise require that uses or development projects conform to it, the AICUZ Study was never intended to be applied in a regulatory fashion, but only as a collaborative tool.  Not so.  According to Public Utilities Code section 21675, subdivision (b), the AICUZ restriction on parking lots in the Clear Zone is mandatory because the ALUC Plan must be "at least as protective" as the AICUZ.  (*Muzzy Ranch 2008*, *supra*, 164 Cal.App.4th at p. 11.)  Nonetheless, relying on footnote 1 (AICUZ Study, Appendix A, Table A-1), Appellants contend the AICUZ compatibility table is for comparison

purposes only, not to ban all automobile parking in the Clear Zone. They argue that further evaluation may be needed to determine compatibility. Given the specific language in AICUZ that strictly prohibits parking lots in the Clear Zone, we disagree. Nonetheless, assuming without deciding Appellants' argument, further evaluation (more than a negative declaration) is necessary to determine the parking lot's compatibility in the Clear Zone.

b. Other prohibited uses in the Clear Zone

The "compatibility criteria" that shall be applicable to the March ARB/IPA influence area are set forth in Table MA-2 of the ALUC Plan. Table MA-2 identifies the Clear Zone's prohibited uses as all non-aeronautical structures, assemblages of people, objects exceeding FAR Part 77 height limits, all storage of hazardous materials, and hazards to flight. Table MA-2 also imposes a density/intensity standard of zero people per acre in the Clear Zone. According to Appellants, the Project does not result in an assemblage of people, does not include the storage of hazardous materials, and does not constitute a non-aeronautical structure. They maintain that it reasonably qualifies as open land.

To begin with, Appellants argue the ALUC Plan does not forbid automobile parking because the statement in Table MA-2 that identifies automobile parking as a prohibited use is subject to footnote 3. Footnote 3 states that the uses listed are the ones that are "explicitly prohibited regardless of whether they meet the intensity criteria." However, the footnote refers to Appendix D "for a full list of compatibility designations

22

for specific land uses." According to Appendix D, automobile parking is "[p]otentially compatible *with restrictions*" in Compatibility Zone A, the Clear Zone. While we conclude the specific language prohibiting parking lots controls, assuming, for the sake of argument, Appellants' interpretation of Appendix D, further evaluation (more than a negative declaration) is necessary to determine the parking lot's compatibility in the Clear Zone.

Appellants argue the Project will not result in an "assemblage of people" because users will not remain in the parking lot for extended periods of time, but will drive in and out and wait for a shuttle bus. Pointing out that agricultural use of the property would involve the entry of people into the Clear Zone, Appellants argue Respondents' interpretation of assemblage of peoples results in "both a regulatory and physical 'taking' of the Property under the 5th and 14th Amendment to the United States Constitution." In contrast to agricultural use, the proposed automobile parking lot will have nearly 200 vehicles with at least one driver, possibly passenger(s), accessing the lot 24 hours a day, seven days a week. The occupants of the vehicles will have to gather and wait on site for shuttles, up to 12 shuttles driving people on and off the site every day. There will also be two on-site security guards. As Respondents point out, assemblage means "a collection" or "gathering" of "persons." (Meriam-Webster.com (2025) <https://www.merriam-webster.com/dictionary/assemblage> [as of Oct. 14, 2025].) From the time of their arrival until their departure, people will be gathering in the parking lot.

Next, Appellants argue the Project does not include the storage of hazardous materials because ordinary gasoline tanks in cars do not constitute "aviation fuel and other aviation-related flammable materials," the "manufacture or bulk storage of hazardous materials (toxic, explosive, corrosive)," or the "aboveground storage of more than 6,000 gallons of nonaviation flammable materials per tank." Footnote 14 of Table MA-2 defines hazardous materials as "toxic, explosive, corrosive," and "[a]ll storage of hazardous materials" is prohibited. Gasoline in automobile tanks constitute hazardous materials. (Code of Reg, Title 8, section 339, subd. (b)(3); <California Code of Regulations, Title 8, Section 339. The Hazardous Substances List> [as of Oct. 14, 2025].)

Appellants assert the Project does not qualify as a "non-aeronautical structure" because it is not a "structure." Respondents point out that the Project includes the installation of parking gates and bollards. Although the ALUC Plan does not define the term "structure," the City defines it as including "anything constructed or erected that requires a location on the ground . . . but not including a fence or a wall used as a fence . . . or access drives or walks." Based on the City's definition, parking gates and bollards constitute structures.

Finally, Appellants contend the parking lot reasonably qualifies as "open land" pursuant to ALUC Policy 4.2.4. The ALUC Handbook identifies the criteria for open land as being "free of most structures and other major obstacles such as walls, large trees or poles (greater than 4 inches in diameter, measured 4 feet above the ground), and overhead wires," and having "minimum dimensions of approximately 75 feet by 300 feet

24

(0.5 acres)." It further states that road and automobile parking lots are acceptable as open land areas if they meet this criteria, and "providing contiguous landscaped and parking areas is encouraged as a means of increasing the size of open land areas." Again, assuming without deciding Appellants' argument, further evaluation (more than a negative declaration) is necessary to determine the parking lot's compatibility in the Clear Zone.

c. The City's conclusion was "arbitrary and capricious"

Appellants assert the superior court's ruling fails to explain how the City's conclusion was "arbitrary and capricious" or how a reasonable person could not have found the Project was consistent with the ALUC Plan. Not so. Having considered each of the court's reasons for finding the Project to be inconsistent with the ALUC Plan, we agree with its ruling. No reasonable person could have found the Project to be consistent with the ALUC Plan when the 2018 AICUZ prohibits parking lots in the Clear Zone. Appellants' argument to the contrary, at best, warrants further evaluation.

d. SP208

Finally, Appellants contend the parking lot is consistent with SP208; however, as we explained in section II.A.2.b., *ante*, since SP208 was never reviewed by the ALUC for consistency purposes, reliance upon SP208 is unwarranted.

*C. CEQA Compliance.*

Appellants argue the superior court erred in concluding the City violated CEQA by adopting an MND instead of preparing an EIR for the Project.

25

*1.  MNDs Under CEQA*

"""[A] public agency pursuing or approving a project need not prepare an EIR unless the project may result in a 'significant effect on the environment' [citations], defined as a 'substantial, or potentially substantial, adverse change in the environment' [citation].  If the agency's initial study of a project produces substantial evidence supporting a fair argument the project may have significant adverse effects, the agency must (assuming the project is not exempt from CEQA) prepare an EIR.'"  [Citations.]

"Substantial evidence is '"enough relevant information and reasonable inferences . . . that a fair argument can be made to support a conclusion, even though other conclusions might also be reached."'  [Citations.]  Substantial evidence includes 'facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts,' but does not include '[a]rgument, speculation, unsubstantiated opinion or narrative.' [Citation.]

"If, following the initial study, '"[t]here is no substantial evidence, in light of the whole record . . . that the project may have a significant effect on the environment,"' the agency may prepare a negative declaration for the project.  [Citations.]  If, however, substantial evidence shows the project may have a significant environmental impact, but the impact can be mitigated to insignificance through project revisions that the applicant agrees to before the agency approves the project, the agency may prepare a mitigated negative declaration (MND) for the project.  [Citations.]"  (*Upland Community First v. City of Upland* (2024) 105 Cal.App.5th 1, 13-14 (*Upland Community First*).)

26

## 2. *Standard of Review for MNDs*

"On appeal from a judgment in a mandamus proceeding under CEQA, our standard of review is the same as the trial court's:  we independently review the administrative record and the lead agency's action, not the trial court's decision and in this sense our review under CEQA is de novo.  [Citations.]  We review an agency's decision to rely on an MND for a ""'prejudicial abuse of discretion,' which 'is established if the agency has not proceeded in a manner required by law or if the [agency's] determination or decision is not supported by substantial evidence.'""  [Citations.]

"'In reviewing an agency's decision to adopt an MND, a court (whether at the trial or the appellate level) must determine whether there is substantial evidence in the record to support a "fair argument" that a proposed project may have a significant effect on the environment.  [Citation.]  The fair argument standard creates a "low threshold" for requiring an EIR, reflecting a legislative preference for resolving doubts in favor of environmental review.  [Citation.]  [¶]  Whether the evidence establishes a fair argument that a project may result in significant environmental impacts is a question of law.'  [Citations.]  The petitioner has the burden of proving 'the existence of substantial evidence supporting a fair argument of significant environmental impact.'  [Citation.]

"Under the fair argument standard, a court may not uphold an agency's decision to adopt an MND, ""'merely because substantial evidence was presented that the project would not have [a significant environmental] impact.  The [reviewing] court's function is to determine whether substantial evidence support[s] the agency's conclusion as to

27

whether the prescribed "fair argument" could be made. If there [is] substantial evidence that the proposed project might have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an EIR and adopt a negative declaration, because it [can] be "fairly argued" that the project might have a significant environmental impact. Stated another way, if the . . . court perceives substantial evidence that the project might have such an impact, but the agency failed to secure preparation of the required EIR, the agency's action is to be set aside because the agency abused its discretion by failing to proceed "in a manner required by law."'" [Citations.] In sum, under the fair argument standard, 'deference to the agency's determination is not appropriate and [the agency's] decision not to require an EIR can be upheld only when there is no credible evidence to the contrary.' [Citation.]" (*Upland Community First*, *supra*, 105 Cal.App.5th at pp. 14-15.)

3. *Analysis*

Appellants contend the City complied with CEQA because any alleged public safety impacts from the Project are speculative and fail to constitute a significant impact on the environment. They further maintain the Initial Study adequately discussed the Project's potential conflicts with applicable land use plans and correctly concluded that none exist. As we explain, we disagree.

The Project site is located in an area subject to an ALUC plan and designated as Zone A (Clear Zone). Given this location, CEQA has special requirements for projects within an ALUC Plan area that expressly discourage MNDs: "[a] lead agency shall not

28

adopt a negative declaration [or MND] for a project [within an ALUC Plan] unless [it] considers whether the project will result in a safety hazard or noise problem for persons using the airport or for persons residing or working in the project area." (Pub. Res. Code, § 21096, subd. (b); see *California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 391; Cal. Code Regs. Tit. 14, § 15074, subd. (e).)

Here, the MND notes that the Project is located within Zone A of the ALUC Plan (Clear Zone) which "prohibits non-aeronautical structures, assemblages of people, objects exceeding height limits determined by the Federal Aviation Administration (FAA), all storage of hazardous materials and all hazards to flight," and "within [SP208] [Clear Zone,] which identifies agriculture, automobile parking and open space as compatible land uses." Nonetheless, the City relied primarily on SP208 and reasoned that because "there are no structures, assemblage of people, objects exceeding FAA height limits, nor storage of hazardous materials proposed on the Project site. . . . Project implementation would cause a less than significant impact"

The City erred in solely relying on SP208 to approve an MND for the Project. As we previously discussed, SP208 is inconsistent with other applicable land use plans (AICUZ, the ALUC Plan, and the General Plan) and was never reviewed by ALUC. Moreover, the MND fails to disclose that (1) the most recent AICUZ specifies that automobile parking is not compatible with the Clear Zone, and (2) the Project site is subject to an avigation easement. Interestingly, a prior draft version of the MND

29

disclosed the easement.  City Associate Planner Julia Descoteaux (JD) asked, "Has the easement holder concurred with the proposed project/land use?" and "Was there a discussion with the [March ARB] on the Applicants [*sic*] side?"

According to the prior draft MND, the Clear Zone easement was recorded in 1984 and "grants March Air Force Base (AICUZ) the right to prohibit all land uses other than agriculture; grazing (excluding feed lots and dairy herds); permanent open space; existing water areas; rights-of-way for fenced two-lane highways, without sidewalks or bicycle trails, and single tract railroads; and communications and utilities rights-of-way (see Appendix J)."  The draft MND also stated that "the City adopted [SP208] on June 27, 1989, which permits open space, agricultural, automobile parking, and roads.  Thus, *under the approved Specific Plan, the parking lot is permitted*."  Regarding the last sentence's claim, JD emailed City personnel and questioned whether "SP208 overrides the [Base AICUZ's] easement."  Subsequently, she emailed the applicant's consultant and asked, "Have you or the applicant contacted the Base to discuss the proposed project?  If so, can you please provide documentation of their support of the project given they have easements over the property that restrict its use."

Despite JD's questions and concerns, the final MND failed to mention the AICUZ or the Clear Zone Easement.  CEQA requires a good faith effort at full disclosure, "it does not require perfection, nor exhaustive analysis."  (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 342; see *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 515 [courts look for """"adequacy,

30

completeness and a good-faith effort at full disclosure'""""].) By failing to disclose the AICUZ and the Clear Zone Easement, the final MND ignored the substantial evidence of a fair argument that the Project may result in a potentially significant environmental impact by locating an incompatible use within the Clear Zone in violation of the 2018 AICUZ, the ALUC Plan, and the avigation easement. (Cal. Code Regs. Tit. 14, §§ 15064, subd. (f)(1), 15384, subd. (a); *McCann v. City of San Diego* (2021) 70 Cal.App.5th 51, 87 [MND sufficient only if no substantial evidence supporting a fair argument the project may have significant effect].)

The City's failure to disclose the conflicting land use plans alone provided sufficient reason for the superior court to grant the peremptory writ of mandate. However, the court also found substantial evidence the Project may have significant environmental risks in the event of an aircraft crash due to the presence of hazardous materials and the assemblages of people. Appellants contend this finding "concerns potential impacts that could occur if and only if a plane were to crash into the Parking Lot at some point in the future." They argue these potential public safety impacts are not "environmental effects" as defined by CEQA because they are not "caused" by the Project. (*Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 473-474 [an EIR did not need to address impacts relating to "sea level rise resulting from global climate change" on a proposed mixed-use development where the project itself would not cause sea levels to rise].) They maintain that these alleged impacts are

31

indirect and not reasonably foreseeable because they are speculative and unlikely to occur. We disagree.

As Respondents note, Appellants dismiss the fact that CEQA imposes additional requirements for projects within an ALUC Plan boundary. (Pub. Res. Code, § 21096.[6]) More specifically, a lead agency must "use certain technical resources when addressing airport-related safety hazards and noise problems in EIRs for projects near airports ([Pub. Res. Code,] § 21096, subd. (a))," and may not "adopt[] a negative declaration without considering 'whether the project will result in a safety hazard or noise problem for persons using the airport or for persons residing or working in the project area.' ([Pub. Res. Code, § 21096, subd. (b).))" (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 391.) The record contains substantial evidence that demonstrates the Project will result in safety hazards.

Representatives of several public agencies presented evidence of the safety hazards associated with a parking lot located in the Clear Zone. Appellants fault the superior court's reliance on "comments from [these] public agencies, including the Air Force, March JPA, Riverside County, and ALUC," which they claim do not constitute

_____

[6] "(a) If a lead agency prepares an environmental impact report for a project situated within airport land use compatibility plan boundaries . . . the Airport Land Use Planning Handbook published by the Division of Aeronautics of the Department of Transportation, in compliance with Section 21674.5 of the Public Utilities Code and other documents, *shall* be utilized as technical resources to assist in the preparation of the environmental impact report as the report relates to airport-related safety hazards and noise problems. [¶] (b) A lead agency shall not adopt a negative declaration for a project described in subdivision (a) unless the lead agency considers whether the project will result in a safety hazard or noise problem for persons using the airport or for persons residing or working in the project area." (Pub. Res. Code, § 21096.)

32

expert testimony. Assuming, without deciding, their claim as to the Air Force, March JPA, and Riverside County, we reject it as to ALUC.

As previously stated, the SAA provides for the establishment of ALUC's in California counties "to protect public health, safety, and welfare by ensuring the orderly expansion of airports and the adoption of land use measures that minimize the public's exposure to excessive noise and safety hazards within areas around public airports to the extent that these areas are not already devoted to incompatible uses." (Pub. Util. Code, § 21670, subd. (a)(2).) Each ALUC must include at least two aviation experts. (Pub. Util. Code, §§ 21670, subd. (b)(3), 21670.1, subd. (b).) ALUC's prepare and adopt plans, have jurisdiction over the areas around civilian and military airports, and determine whether a city's general plan, specific plans, and amendments thereto, are consistent or inconsistent with the applicable ALUC plan. (Pub. Util. Code, §§ 21674, 21675, subds. (a), (b), and 21676, subds. (a), (b).) Thus, ALUC is the expert on its plan's requirements and compatible land uses around March ARB. As such, the facts and opinions from this agency constitutes substantial evidence of a fair argument regarding the Project's potential significant safety hazards.

Notwithstanding the above, Appellants assert the alleged public safety impacts from the Project are speculative and fail to constitute a reasonably foreseeable significant impact on the environment. They argue that "any attempt to evaluate the potential environmental impacts of the highly remote and speculative possibility that a plane might crash on the Parking Lot would be meaningless." They cite *Santa Rita Union School*

33

*District v. City of Salinas* (2023) 94 Cal.App.5th 298, 332 (*Santa Rita USD*) and two other cases that stand for the proposition that an EIR is not required to speculate on future environmental consequences. *Santa Rita USD* held that "CEQA review is . . . not triggered where there is not yet an identifiable impact as until that point, the review process could not be meaningful in the sense that it allows consideration of alternatives that could mitigate the impact." (*Id.* at p. 332.) However, it also held "'"[t]he fact that precision may not be possible . . . does not mean that no analysis is required."'" (*Id.* at p. 331.) Rather, the "'lead agency must use its "best efforts" to evaluate environmental effects, including the use of reasonable forecasting.'" (*Ibid.*) Here, the identifiable impact is a plane crashing into the vehicles and occupants at the Project site. Since the Project is located in the Clear Zone and is subject to the easement, the City was remiss in failing to undertake any analysis of the reasonably foreseeable significant and identified public safety impact from a plane crash.

In short, the City violated CEQA by adopting an MND despite the substantial evidence in the record to support a fair argument that the Project may have significant effect on the environment.

## III.  DISPOSITION

The judgment is affirmed.  Respondents are awarded costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER

J.

We concur:

RAMIREZ

P. J.

CODRINGTON

J.